UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA

    - against -

JACQUES DURAND,

              Defendant.
------------------------------------------------------------x

MEMORANDUM AND ORDER
15-CR-00531 (ILG)

GLASSER, Senior United States District Judge:

    In 2016, after a four-day jury trial, defendant Jacques Durand was convicted of access device fraud and aggravated identity theft. Prior to trial, a motion to suppress a cellphone number given in response to a question asking for it was denied without a hearing, the Court having determined that the pedigree exception to *Miranda* made a hearing superfluous. The Court of Appeals found that an evidentiary hearing should have been held to ascertain whether the questions "that proceeded the issuing of *Miranda* warnings to Durand were asked as part of a 'non-investigative booking process,' 'appeared reasonably related to [the postal inspectors'] administrative concerns,' and were not likely to elicit incriminating information." *United States v. Durand*, 767 F. App'x 83, 88 (2d Cir. 2019) (quoting *Rosa v. McCray*, 396 F.3d 210, 221 (2d Cir. 2005)). The Second Circuit also directed that the Court consider, if the inspectors "violated Durand's Fifth Amendment protections," whether "we need not suppress his phone number because the government would have inevitably discovered it." *Id.* at 88 n.5.

    Pending before the Court is the result of the suppression hearing. The only witnesses to testify were United States Postal Inspection Service ("USPIS") Inspectors Glen McKechnie and Yseult Belfort, both of whom the Court found credible. For the reasons that follow, Durand's motion is **DENIED**.

1

**BACKGROUND**

The facts leading to Durand's arrest are adequately related in the Second Circuit's remand opinion. *See id.* at 85. Presented here are only those facts which set the scene for an understanding of the discrete issues in this case.

Durand's offense of conviction involved stealing credit cards from mailboxes and calling the issuing banks to activate and inquire about the accounts. The phone numbers used to make those calls were captured by the banks. Once activated, Durand made purchases and cash withdrawals on the stolen cards. Following reports of a mail theft in Elmont, New York, USPIS began investigating and received (1) descriptions of the suspect and his vehicle, (2) between five and seven phone numbers used to inquire about the stolen cards, and (3) ATM video surveillance of the suspect.

**<u>Durand's Arrest</u>**

On June 9, 2015, Durand was arrested in Brooklyn by McKechnie, the government's principal witness, together with Belfort and two others. The inspectors observed Durand—who resembled the suspect—enter a vehicle identified by an eyewitness to the mail theft. After the inspectors approached, Durand consented to a search, which produced the phone that proved significant to the investigation, along with cash and various personal items. Durand was arrested and driven to USPIS offices in Garden City where he was brought to an interview room.[1]

As was his usual practice, McKechnie informed Durand why he was arrested and advised him of his *Miranda* rights using a standard USPIS form, GX604.[2] When Durand invoked his right

---

[1] McKechnie testified that he originally planned to take Durand to the Nassau County Police Department ("NCPD") where he would be processed on state charges. Believing they were not yet ready to receive him, McKechnie brought Durand to USPIS offices.

[2] Citations to "GX" refer to the government's exhibits.

to counsel, McKechnie closed his investigative file and asked no further questions pertaining to the investigation or the activating phone numbers captured by the banks. McKechnie did, however, begin a pedigree interview, consistent with USPIS policy. McKechnie's questions closely tracked the United States Marshals Service Prisoner Intake Form ("Prisoner Intake Form"), GX602, which he knew from memory and did not read.

After transcribing information listed on Durand's driver's license, McKechnie asked for a social security number. Because Durand could only provide a partial number, one of the inspectors read his complete number to him, which Durand confirmed was his. McKechnie then asked for an address. When the address provided did not match the one listed on Durand's license, McKechnie inquired about the discrepancy. Durand explained that he was staying with friends, but he could not recall the last name of the individual he was living with. When McKechnie asked if Durand had any relatives, Durand stated that he had five children, but he could not remember the last name of his eldest child.

McKechnie next asked for a phone number. Durand provided one ending in "7996," which Belfort dialed and discovered was not in service. She informed McKechnie of that fact, who then asked Durand why he "lied" and provided a "nonworking" number.[3] (Tr. 37:11-12). Durand responded that he "made a mistake." (Tr. 38:2-3). McKechnie then asked for the number of the cellphone Durand had in his possession. Durand gave a number ending in "9768," which Belfort verified was correct. At the time, McKechnie did not know the specific significance of the "9768" number and he continued asking pedigree questions. After completing the interview, the inspectors drove Durand and his phone to NCPD, but retained his cash and personal items.

---

[3] The hearing testimony was somewhat unclear as to whether McKechnie told Durand that he lied or asked him why he did so. McKechnie acknowledged that he "may have" asked Durand that question, and Belfort's testimony confirmed that he did. (*See* Tr. 65:7–66:1, 88:10-25).

3

McKechnie testified that when Durand was brought to NCPD, he inferred that they would obtain a search warrant for the contents of the phone. Had he retained the phone, McKechnie stated that he would have sought a search warrant:

> Q. Had Nassau County not taken the case would you have kept the phone?
> A. Yes.
> Q. Why?
> A. I would have kept the phone if Nassau County wouldn't have taken it because I would have looked to get either a search warrant or gather some information relative to the phone.
> \* \* \*
> Q. Had you not got the defendant's number from the pedigree questioning, would you have pursued those other methods?
> A. I would have.

(Tr. 45:4–46:3). Inspector Belfort affirmed at the hearing that she ultimately did obtain a warrant for the contents of the phone, which revealed its number. That fact was also adduced at trial:

> Q. The phone in evidence is Government Exhibit 109. Was that subjected to a search?
> A. Yes.
> Q. And based on that search, was law enforcement able to identify the telephone number assigned to the device?
> A. Yes.

(6/28/16 Trial Tr. 209:20-25).

## DISCUSSION

### I. *Miranda* and the Pedigree Exception

Under the Fifth Amendment: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To preserve this right, an individual subjected to custodial "interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation," and that anything stated during the interrogation "can be used in evidence against him." *Miranda v. Arizona*, 384 U.S. 436, 471 (1966). These warnings are an absolute prerequisite to interrogation, which includes express questioning and "any words or actions on the part of the police (other than those normally attendant

4

to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

As is now well settled, *Miranda* warnings are not required for questions seeking pedigree information incident to an arrest during a non-investigative booking process. This "exception" applies when the question asked by an officer "(1) seeks 'biographical data necessary to complete booking or pretrial services,' (2) 'appear[s] reasonably related to the police's administrative concerns,' and (3) . . . is not likely to elicit an incriminating response." *Durand*, 767 F. App'x at 87 (quoting *Rosa*, 396 F.3d at 221). In this case, whether the government has met its burden as to each of these elements is directly in dispute. *See United States v. Chandler*, 164 F. Supp. 3d 368, 380 (E.D.N.Y. 2016) (once a movant demonstrates a basis for the motion "the burden then shifts to the government to demonstrate by a preponderance of the evidence" that the conduct did not offend the Constitution (citation omitted)).

### A. Necessary Pedigree Information

Under the first element, Durand's principal argument is that the inspectors' questions were unnecessary because USPIS did not book or process him, NCPD did. (ECF No. 106 at 11). That argument fails for two reasons. First, the inspectors did participate in processing Durand's arrest. Not only did they effectuate the arrest, they took inventory of items seized during the arrest, vouchered those items, and later returned his property. That is an integral part of the booking process. Thus, Durand's assertion that he was "not booked or processed at all" by USPIS is incorrect. (*Id.*). Moreover, the inspectors credibly testified that they participated in a non-investigative process to obtain information necessary to verify Durand's identity and accurately record his arrest.

Second, Durand relies on a problematic interpretation of the exception that prohibits arresting officers from asking pedigree questions unless—and until—they formally book an arrestee.[4] He is even willing to concede that "this case might well be different" if the inspectors booked him on federal charges. (ECF No. 110, "Reply" at 2). But those facts do not substantially alter the analysis. Durand's Fifth Amendment rights do not hinge on which agency, or agent, asked him pedigree questions or completed his paperwork.[5] Indeed, "the distinction between a permissible and impermissible question does not depend on the filing of a piece of paper or some time-span the Defendant argues is sufficient for 'booking.'" *United States v. Pabon*, 603 F. Supp. 2d 406, 410 (N.D.N.Y. 2009).

Durand also claims that McKechnie's questions were not necessary because they deviated from the Prisoner Intake Form. As far as the Court is aware, no rule mandates such rigid conformity. In fact, numerous authorities suggest otherwise. *See, e.g.*, *Rosa*, 396 F.3d at 214 ("What is your *real* hair color?" (emphasis added)); *United States v. Adegbite*, 877 F.2d 174, 176 (2d Cir. 1989) ("You are Gbenro, aren't you?"). Here, the government has met its burden by demonstrating that McKechnie's questions closely tracked the Prisoner Intake Form and were necessary to identify Durand.[6]

---

[4] That reading fails to account for the realities of law enforcement, where arrests are frequently carried out by multiple agencies.

[5] Durand apparently acknowledges that there is no temporal requirement. (*See* Reply 4 (it is "presumably true" there is no rule that processing occur at one point in time)).

[6] Several of Durand's responses required clarification and, as addressed below, follow up questions were necessary to ensure the information he provided was accurate.

### B. Administrative Concerns

The government has also established that the questions asked of Durand were reasonably related to the inspectors' administrative concerns.[7] Their questions served the purpose of: "confirming the defendant's identity, ensuring that law enforcement authorities could contact the defendant at a later date or return property, and developing information that might be useful in locating the defendant should he flee or fail to appear in court when required to do so." (ECF No. 109 at 6). Although the inspectors planned to transport Durand to NCPD, that did not render the collection of pedigree information improper. The inspectors maintained a valid administrative interest in accurately identifying Durand and keeping a record of his arrest. The questions asked of him were reasonably related to that end.[8]

Durand urges that his cellphone number was not related to the inspectors' administrative concerns because McKechnie testified that he would have kept the phone had he not given it to NCPD.[9] It is undisputed that the inspectors actually transferred the phone to NCPD. Once in their custody, USPIS presumably had no control over it. Moreover, the inspectors testified that they wanted an accurate number on file. Given the lack of credible pedigree information provided by Durand, that concern was more than reasonable.

---

[7] Durand also questions McKechnie's stated purpose for conducting a pedigree interview: "to . . . gather as much information relative to this person as possible." (Tr. 28:16-18). The Court finds that McKechnie's explanation was no more than an inartful description of a pedigree interview.

[8] Durand claims that questions concerning the "7996" number were not related to an administrative concern. As discussed *infra*, they were necessary to verify his pedigree information.

[9] It is axiomatic that phone numbers fit within the pedigree exception. *See United States v. Durr*, No. 09-CR-6232L, 2010 WL 3199887, at *7 (W.D.N.Y. July 22, 2010) ("Telephone numbers . . . are regularly collected pursuant to routine booking questions.").

### C. Incriminating Response

The third element of the exception asks whether the officers should have known that their questions would elicit incriminating information. Durand insists that because the inspectors knew a small set of phone numbers were important to their investigation, any related questions do not fall within the exception. As tempting as that conclusion might seem in hindsight, careful consideration warrants a different result.

Determining whether law enforcement officers "abused the gathering of pedigree information in a manner that compels *Miranda* protection requires an objective inquiry: Should the police have known that asking the pedigree questions would elicit incriminating information?" *Rosa*, 396 F.3d at 222. Although the test is objective, the officer's subjective intent is also relevant. *Id.* Where an "officer perceives—either through direct observation or otherwise—that a specific piece of information provided by the arrestee is patently incorrect, then it is not only reasonable, but arguably the officer's duty, to inquire further." *Id.* In other words, verification of pedigree information does not ordinarily amount to impermissible custodial interrogation. *See, e.g.*, *Pabon*, 603 F. Supp. 2d at 411 ("[Officer] had to seek clarification or elaboration from [defendant] when he failed to volunteer complete information regarding his name and had to be asked about his middle initial."); *Durr*, 2010 WL 3199887, at *8 ("[The officer]'s follow-up question was permissible under the pedigree exception. Law enforcement agents may ask clarifying or follow-up questions under the pedigree exception . . . ."). Applying that principle here, the inspectors' questions did not abuse the gathering of pedigree information in a manner that compels *Miranda* protection.

By the time the inspectors inquired about his phone number, Durand had already provided what appeared to be facially inaccurate and incomplete information. For example, when asked for

8

his social security number, Durand provided only "a portion of that number." (Tr. 34:19). When asked where he was living, he said he was staying with a friend, but did not recall her last name. Nor could Durand remember the last name of his eldest child. These answers—to the most innocuous pedigree questions—made it reasonable for the inspectors to inquire further when Durand provided a phone number.

After Durand offered the "7996" number, Belfort did precisely what law enforcement officers should when pedigree information appears to be incorrect: she inquired further and dialed the number.[10] In doing so, she learned that the phone was not in service and informed McKechnie of that fact. Although McKechnie accused Durand of "lying," and providing a "nonworking number," that dialogue did not transform the interaction from pedigree interview to custodial interrogation. In fact, McKechnie quickly followed up with a narrowly tailored question asking for the number of the phone in Durand's possession. That inquiry was designed to elicit nothing more than pedigree information.

This case is unlike those in which officers already know of some inculpatory fact which they hope the arrestee will confirm or deny. In such scenarios, any response will provide incriminating information, whether the suspect lies and denies the fact or admits its truth. *See, e.g.*, *United States v. Mateo*, 392 F. Supp. 3d 454, 457, 462 (D. Vt. 2019) (question regarding phone number was improper where the number was already known and phone calls recorded). Here, the inspectors did not have any particularized foreknowledge that asking for Durand's *phone number* would elicit an incriminating response. Although they generally knew phone numbers might be relevant to the investigation, without some direct link indicating an incriminating

---

[10] Such verification is permissible. *See, e.g.*, *United States v. Hill*, No. 12-CR-214 (KAM), 2013 WL 3243657, at *3 (E.D.N.Y. June 26, 2013) ("[Officer] queried the NYPD computer system for the name provided by the defendant, 'MESIAH JOHNSON [sic],' but did not obtain any results.").

9

response was likely, it was reasonable for the inspectors to ask for Durand's cellphone number. That inquiry simply did not present the "inherently compelling pressures" *Miranda* intends to shield. 384 U.S. at 467.

However, Durand's motion is a plain attempt to wield *Miranda* as a sword to invalidate his conviction. As remarked elsewhere:

> To permit a defendant to suppress the truth by his own prevarications would turn *Miranda* into a dangerous sword to be wielded unfairly by the guilty. It would make the law a foolish mockery of common sense.

*United States v. Tavares*, No. 01 CR. 1115 (JFK), 2002 WL 31571662, at *6 (S.D.N.Y. Nov. 18, 2002). That reasoning applies here with equal force and counsels against granting Durand's motion.

## II. Inevitable Discovery

Even if the questions asked of Durand ran afoul of *Miranda*, it is clear the inspectors would have inevitably discovered the "9768" number. The inevitable discovery doctrine provides that the fruits of unlawful police conduct may nevertheless be admissible if the government can prove, by a preponderance, "that the evidence would have been obtained inevitably" without the constitutional violation. *Nix v. Williams*, 467 U.S. 431, 447 (1984); *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts," requiring the "district court to determine, viewing affairs as they existed at the instant before the unlawful [conduct] occurred, what would have happened had the unlawful [conduct] never occurred." *Stokes*, 733 F.3d at 444 (citations omitted). Evidence is admissible if the court "can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Id.* (citation omitted). Further, the inevitability analysis looks to the actions that might

10

have been taken by either the police or third parties acting at the behest of law enforcement. *Id.* at 447.

The Court finds with a high level of confidence that the inspectors would have inevitably obtained a search warrant and discovered Durand's cellphone number. That conclusion is amply supported by the inspectors' testimony, which leaves little doubt that there was probable cause to search Durand's cellphone. Thus, even without Durand's pedigree statements, the inspectors would have discovered the "9768" number and connected him to the stolen credit cards.

## CONCLUSION

For the foregoing reasons, Durand's motion to suppress is **DENIED**.

SO ORDERED.

Dated:     Brooklyn, New York
           June 16, 2020

/s/
I. Leo Glasser                                    U.S.D.J.